FREDERICK J. GRACE, Appellant, Respondent, v. WILLIAM H. OLIVER, Respondent, Appellant.

Second Department, November 12, 1926.

**Joint ventures — action to dissolve joint venture and for accounting — venture consisted of speculation in real property — agreement was oral except for memorandum executed after original agreement — plaintiff furnished all capital and title was taken in his name — evidence sustains finding that parcel of land owned by plaintiff at time of agreement was included in joint venture — evidence does not sustain contention of defendant that he is entitled to commissions for purchases and sales of property included within joint venture.**

In an action to dissolve a joint venture and for an accounting, in which it appears that the agreement between the parties was oral except for a memorandum executed some time after the original agreement was made, and that the plaintiff furnished all the capital and took title to the real property while the defendant furnished his time and experience as a real estate broker, the evidence sustains the contention of the defendant that a parcel of land owned by the plaintiff at the time of the original agreement was included within the joint venture.

The evidence does not sustain the contention of the defendant that there was an agreement whereby he was to receive commissions on all purchases and sales made for the purpose of the joint venture.

CROSS-APPEALS by the plaintiff, Frederick J. Grace, and by the defendant, William H. Oliver, from portions of an interlocutory judgment of the Supreme Court, entered in the office of the clerk of the county of Westchester on the 7th day of July, 1926, upon the decision of the court rendered after a trial at the Westchester Special Term.

*Robert McLeod Jackson* [*Thomas G. Barnes* and *Leavitt J. Hunt* with him on the brief], for the plaintiff.

*Humphrey J. Lynch*, for the defendant.

MANNING, J. This action is one to dissolve a copartnership or joint agreement at will between the parties for the purchase and sale for speculation and profit of certain real properties situate in and about the village of Ossining, county of Westchester, State of New York. The interlocutory judgment in its scope is limited to certain issues tried out before the court in this action, and such interlocutory judgment appoints a receiver and also directs that an accounting be had between the parties before former Justice MILLS, as official referee. The accounting has been suspended and meanwhile there are before us two questions on this appeal. The plaintiff appeals from so much of the interlocutory judgment as decrees that a certain parcel of real estate known as the " Briar

Patch " property, set forth and described in the answer, be deemed a part of the copartnership property, while the appeal of the defendant is from so much of the said interlocutory judgment as decrees the dismissal of the defendant's claim for commissions arising out of the sale and purchase of the real property of the copartnership.

After hearing the evidence of both parties at the trial, the learned trial justice rendered this brief opinion: " I find that the Briar Patch property belongs to the partnership and that the defendant is not entitled to commissions. Submit findings and interlocutory judgment accordingly and referring the case to Hon. Isaac N. Mills, Official Referee, to take and state the account."

The complaint alleged a partnership agreement concerning certain real properties between the parties and asked for a dissolution of the same and for an accounting.

The answer set up in detail the nature of the contract between the parties and then alleged as a counterclaim an agreement whereby, for a valuable consideration, the " Briar Patch " property, originally owned by the plaintiff, became a part of the partnership property in the month of March, 1920; and further, that the defendant was entitled to five per cent commission on all purchases and sales of real property bought and sold under the copartnership agreement. It is also alleged in the answer that eight parcels of real property were bought and portions thereof sold in pursuance of the agreement between the parties. The answer concluded with a demand for a dissolution of the copartnership or joint agreement, and an accounting.

It is undisputed that the eight parcels of real property contained in paragraph 22 of the defendant's answer are covered by the partnership agreement. The agreement itself was an oral one, except as set forth in a memorandum agreement between the parties dated June 29, 1922. It is also undisputed that the plaintiff was to furnish all capital to finance the partnership dealings. According to the agreement the defendant was to use his energy and ability as a broker and otherwise in furtherance of and in the transaction of all business carried on under its terms; and title to all real property, mortgages, securities or other property acquired by the parties was to be taken in the name of the plaintiff during the operation of the agreement; and the parties were to divide equally all net profits derived from the transaction of such business, to be determined after all expenses necessarily incurred in the carrying on of the same had been paid.

The property known as the " Briar Patch " was sold in the month of February, 1919, by the defendant, as a real estate broker,

to the plaintiff, for the sum of $14,500. This property was subject to mortgages aggregating $11,000, and $3,500 cash was paid at the time of taking title. This fact is contained in finding No. 8, and seems to be unquestioned.

The learned trial justice found that the plaintiff, prior to February, 1919, did not reside within the county of Westchester, but that " in or about the month of July, 1919, the plaintiff lived with the defendant at his home in Ossining, New York, and during the summer of 1919 up to and including 1923 the defendant's family lived with the plaintiff upon his farm and in the winter time the plaintiff lived with the defendant's family at his house in Ossining." The court found that during a period of time the plaintiff lived with the defendant, whether at his farm or at the home of the defendant, plaintiff did not pay anything toward his board and lodging, and from the month of July, 1919, down to the month of December, 1919, paid nothing for such board and lodging; that during the period of time from July, 1919, down to and including the fall of 1923, the plaintiff was from time to time in ill health and the defendant and his wife gave him great care and attention; that in the month of December, 1919, the plaintiff agreed to pay to the defendant for such board and lodging and attention and services the sum of $100 per month and this sum was paid for a period of four months up to and including March, 1920. The court further found that in the month of March, 1920, the plaintiff and the defendant entered into an oral agreement whereby the plaintiff agreed to put the Briar Patch property into the partnership agreement in consideration of the defendant's agreeing to board and lodge the plaintiff at his farm when they should live there and at the defendant's house when they should live there, and also to assist in taking care of the farm and running the same and doing all the necessary things that would be required in taking care of a dairy farm; that the defendant, in pursuance of this agreement, did board and lodge the plaintiff at his farm and at the defendant's home and also assisted in taking care of the farm and running the same and doing all the necessary things required in properly taking care of a dairy farm, in accordance with such agreement, down to some time prior to the commencement of this action. There were also findings by the court that in connection with the Briar Patch property the plaintiff agreed to pay the interest on the mortgages and taxes against the defendant's taking care of and running the farm and against the payment to the defendant of any further board; that certain sums of money were paid out of the " special account " of the partnership for work done on a dam located on the Briar Patch property; that the defendant super-

22

vised the building of the dam and the clearing of the property for the dam, and did a large amount of manual work in cutting a large number of small trees on the property; and that the plaintiff and defendant went to the property several times to look it over for the purpose of developing the same. It was found that the defendant duly performed all the conditions and agreements on his part to be performed pursuant to said agreement as to the Briar Patch property being placed in the partnership account and that upon demand the plaintiff refused to place the Briar Patch property in said joint account.

A reading of the testimony of the plaintiff will be sufficient to make it appear that the finding of the learned court that the Briar Patch property was to be considered part of the joint venture or partnership agreement is fully supported by the evidence.

On cross-examination the plaintiff said that he first met the defendant in 1919, when the defendant, as a broker, brought the Briar Patch property to the plaintiff's attention. The plaintiff was either very dense or very evasive during his examination, for at the very outset he said that he did not know what he paid for the property but he thought it was $14,500. He was rather feeble in his answer as to what dealings he had with this particular property, concerning how much cash was put in and how much cash was taken out. He admitted that a dam had been built upon the property and that Mr. Oliver, the defendant, had helped him build it. Immediately thereafter he contradicted this statement and said that Oliver did not have anything to do with it. He admitted that it was in the summer of 1919 that he commenced living at the defendant's house, where he stayed for about two years, and that he did not pay anything for this. He testified that he told the defendant and his wife that he would not live longer with them unless he was allowed to pay board — something toward the household expenses. He further testified that he paid $100 a month, but could not tell for how long he had paid it. He admitted, though, that he stopped payments after a very few months. He denied having any talk with the defendant in reference to the Briar Patch property at the time when he stopped paying board, and then testified that the defendant objected to his paying board.

A letter was offered in evidence reading as follows:

> " FREDERICK J. GRACE
> "211 Pearl Street
> "New York
>                                         "*Oct.* 4, 1924.

"DEAR Mr. OLIVER.— On the 10th of the month I have to pay $2500.00 on the Morristown property so if you want to, whatever amount you wish to send me out of the Joint account would come

in very handy. I have in mind that I must owe you personally quite a lot of money — wish you would tell me how much.

"Yours,

"FRED. J. GRACE."

Neither the learned court nor the attorney for the defendant could get the plaintiff to answer questions concerning how much money the defendant had laid out for the plaintiff. The plaintiff admitted that he did owe the defendant money but he had no knowledge of the amount. In testifying concerning acts of kindness and personal attention on the part of the defendant and his wife, the plaintiff said: " I am willing to admit anything of that kind. They were exceedingly kind at that time to me and did wonderful things for me." He was asked: " Q. And you appreciated it at that time, did you? A. I certainly did. God knows I did."

The further cross-examination of the plaintiff clearly indicated that the defendant did considerable work for the plaintiff on the farm and that the plaintiff had never paid the defendant any money therefor. Plaintiff was asked if he knew a man named Francis W. Gradwohl. He said he did; that he was a neighbor, and lived right across the way. He was asked if he ever discussed the Briar Patch property with Gradwohl, and he said that he positively had not. Then he said that if he talked about any property it was the Briar Patch property and the farm, but he could not remember whether he talked about them with him or not. He was asked: " Q. Well, now, you just said you never spoke about the Briar Patch and now you say you don't know? A. I didn't say any such thing. By the Court: Q. Well, you did say it. Perhaps you didn't mean to. You said you never spoke to him about the Briar Patch. A. Well, I beg your pardon. I didn't mean that. Q. You did talk with him about the Briar Patch? A. I dare say. Q. And do you remember how many times? A. No, I don't remember, but there is no doubt that I did talk."

On cross-examination the plaintiff admitted that he had offered, several times, to give the defendant a half interest in the Briar Patch property and that the first offer was made in 1922.

In view of these admissions by the plaintiff, the very unsatisfactory character of his testimony, and his method of testifying, I am not surprised that the learned judge determined that there was sufficient proof before him to enable him to decree that the Briar Patch property was embraced within the joint venture.

The defendant's testimony that the Briar Patch property was part of the partnership realty was corroborated by his wife and

**340** GRACE *v.* OLIVER.

by a Mr. Montague, who had had business dealings with the plaintiff and defendant.

The evidence clearly indicated that the Briar Patch property was, as I have said before, to be considered partnership property.

So far as the question of commissions on purchases and sales is concerned, the defendant's claim for such commissions is based upon the allegation that when the plaintiff refused and neglected to furnish the necessary capital to finance the proposed deals in real property under the joint venture agreement, the plaintiff agreed with the defendant that the defendant should have a commission of five per cent on all purchases and sales of real property in the same manner as he would have if he were dealing with a stranger. The testimony on this question as to commissions is somewhat conflicting. The defendant testified that he made no claim for commissions on the first three purchases, and on the whole I am inclined to think that the defendant's claim for commissions is not very well supported. An examination of the defendant's counterclaim discloses that it was not on purchases for the joint venture or for the plaintiff that defendant claimed commissions, but upon sales only. Defendant testified that in May, 1920, he made a new agreement with the plaintiff whereby he was to receive a commission on all subsequent purchases and sales made for the partnership. Thereafter certain purchases were made by the partnership, and on some of these the defendant was allowed a commission by the seller. The commissions thus received were, according to the defendant, deposited in the special account of the partnership. It is undisputed that no entry was made in the partnership books indicating that the defendant ever claimed commissions. He was asked: " Q. Did you enter anything upon any book of account anywhere on that point? A. Not on that point. It was a verbal agreement." I think from this it will be apparent that what the defendant did with the moneys which he received as commissions on the later purchases was in exact conformity with what he should have done with them in accordance with the terms of the partnership agreement between them as the plaintiff alleges it to be, and as the court found it to be, namely, that no commissions were to be charged. The plaintiff points out that this disposition of commissions received by the defendant on purchases for the partnership is in conformity with the rule that one partner cannot profit at the expense of his associate. Another significant fact is that the written memorandum of the partnership agreement, dated June 29, 1922, contains no provision for the payment of commissions to the defendant. The fact that the defendant never claimed to be entitled to any commissions is further borne out by

a careful examination of defendant's letters. I think this correspondence, taken in connection with the oral testimony offered upon the trial, furnished sufficient evidence to warrant the court in finding against the defendant on the question of commissions.

From a careful reading of the record, I am of the opinion that this was a joint venture in which each of these parties was to share the profits, after the payment of the carrying charges and the cost of purchases, of their various real estate speculations. I think the record fully bears out the wisdom of the decision of the trial justice, that all the properties were to be considered as partnership properties and that no charge for commissions was to be made.

The judgment should be affirmed, without costs to either party against the other.

Present — KELLY, P. J., JAYCOX, MANNING, YOUNG and KAPPER, JJ.

Interlocutory judgment unanimously affirmed, without costs to either party against the other.